## Shelton v. Commonwealth.

Dec. 8, 1939.

734

Marcus C. Redwine and Moss Noble for appellant.

Hubert Meredith, Attorney General, and W. Owen Keller, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY SIMS, COMMISSIONER—Reversing.

The appellant, Andy Shelton, who will be referred

to hereinafter as the defendant, was indicted by the grand jury of Clark County for the wilful murder of Isaac Shelton. His trial resulted in a conviction; the jury fixed his punishment at death and he seeks a reversal of the judgment entered on the verdict on the following grounds: (1) The court erred in refusing to grant his petition for a change of venue; (2) the court erred in overruling his motion for a continuance; (3) five officers testified against him and the court refused to put them under the rule; (4) incompetent evidence was introduced against appellant and competent evidence was excluded; (5) improper opening statement and improper concluding argument made by attorney representing commonwealth.

Andy Shelton, who was 18 years of age at the time he was indicted, occupied an humble station in life. His parents were poor and his education was limited to the fifth grade of the common schools. Shortly before he came to Clark County he had been a member of a CCC camp in Montana. He first came to Clark County in the late summer of 1937 to work as a tobacco cutter, and after that work was finished he returned to his home in Breathitt County. In the fall of 1937 he returned to Clark County during the tobacco stripping season, and around January 1, 1938, entered into a contract with DeGrand Epperson, a brother-in-law of deceased, to raise a small crop of tobacco on the Epperson farm and to work for Mr. Epperson as a farm hand when not engaged in his tobacco crop.

Isaac Shelton was not related to Andy Shelton but they were quite friendly and visited each other often. On the evening of Saturday, June 25, 1938, Andy inquired of Isaac's wife on the street in Winchester the whereabouts of her husband, saying he wanted Isaac to drive him seven or eight miles out to Andy's home at the Epperson farm to get a watch. Around 8 o'clock that evening Isaac and Andy left Winchester on Highway 60 in Isaac's truck to go for the watch. Shortly thereafter Isaac's truck was found about a mile from Winchester on the wrong side of the highway against the fence with its lights burning. Andy was picked up from the highway, very bloody and in a semi-conscious condition. He was taken to the Winchester hospital where he made the statement to DeGrand Epperson that Isaac and he were in the truck going 65 or 70 miles per hour and that they had a wreck. Later Andy

contradicted this statement by saying his injuries resulted from being struck by a hitch-hiker. Isaac was not found that night, but early Sunday morning, some 1500 yards from where his truck had stopped, his body was discovered in a slight swag, partly concealed by a bush, with his face against the fence. His low-cut shoes, both of which were laced and tied, were found some 7 feet from the body. The back of Isaac's head had been beaten with some blunt instrument until his brains oozed out, which with blood and some particles of skull were discernible upon the ground near the body. Andy's injuries were superficial, consisting of abrasions on his face and hands, a knot on his head with the skin unbroken, dry blood on the edge of his nostrils and some blood on his teeth.

Omer Booth, jailer of Clark County, found a rough stone of irregular shape, comparable to a brick in size and weight, directly over the fence from where Isaac's body was lying and 26 feet from the edge of the road. He testified, without objection that this stone had blood on it; that he put his handkerchief over the stone so as not to leave finger prints and delivered it along with the shoes to H. G. Coffey of Winchester, who claims to be a finger-print expert. Andy was charged with the murder of Isaac and after being removed on Sunday from the hospital to the jail, he stated to several persons that he and Isaac met a hitch-hiker on the outskirts of Winchester; that Isaac, over his objections, stopped the truck and directed Andy to get out so the hitch-hiker could be seated between them; that after driving a short distance this hitch-hiker struck him (Andy) on the head, knocking him unconscious and when he came to he was in the hospital.

On his examining trial held in July, Andy was represented by Hon. M. C. Redwine, who together with Hon. Moss Noble defended him in circuit court. It appears from defendant's affidavit filed in support of his motion for a continuance that H. G. Coffey testified on the examining trial as a finger-print expert that the stone and both shoes contained Andy's finger-prints. The examining court held Andy to the grand jury which returned an indictment on September 14th, charging him with the murder of Isaac. On the day the indictment was returned the record shows the defendant was formally arraigned without an attorney and his case was set for trial on September 21st. The record does

not show an attorney was appointed to defend Andy and the affidavit filed for continuance states he was a pauper; that his father was unable to give him material financial assistance; and that it was only on the day before the trial that he was able to retain counsel to represent him, when he employed Mr. Redwine and Mr. Noble.

On September 21st, the day the case was called for trial, defendant filed his verified petition for a change of venue, supporting it with the affidavits of two persons as required by Section 1110, Kentucky Statutes. This section provides that reasonable notice in writing shall be given the attorney for the commonwealth, or in his absence from the county, to the county attorney, that an application will be made for a change of venue. In this instance no notice was given the commonwealth attorney, or the county attorney, and for this reason the commonwealth's objection to the hearing of the petition for a change of venue was sustained by the court. Defendant argues that he was unable to employ counsel until the day before the case was to be tried, hence his attorneys had no opportunity to give notice of the filing of the petition for a change of venue. He also argues the petition itself should be treated as a notice, since the commonwealth attorney was in court the morning it was filed and the court could very readily have passed the hearing to a time sufficient to enable the commonwealth to prepare to meet the issue. This same argument was made in Bishop v. Com., 109 Ky. 558, 60 S. W. 190, 191, wherein a petition for a change of venue was filed without notice, and we there said:

"Without notice, or a waiver of it, the commonwealth was not required to pay any attention to the application; and while the affidavits would, if properly presented to the court, make a prima facie case for a change of venue, * * * it was not presented in such form as to be available."

This Bishop case was followed in Sullivan v. Com., 169 Ky. 797, 185 S. W. 134, wherein the court said that where defendant's petition and affidavits are properly filed they make out a prima facie case for a change of venue and if no witnesses are introduced by either party, the trial court has no discretion in the matter and must grant a change of venue. Higgins v. Com., 94 Ky. 54, 21 S. W. 231; Greer v. Com., 111 Ky. 93, 63 S. W. 443. It is very necessary that the commonwealth

have reasonable notice of the application for a change of venue, because if it is not able to combat the prima facie case made out by the defendant through his verified petition and formal affidavits required by the statutes, the court must grant a change of venue. There was no error committed by the trial judge in refusing defendant a change of venue.

Defendant's affidavit asks for a continuance so that he might investigate Coffey's qualifications as a fingerprint expert and take proof concerning same. It states that on his examining trial, Coffey testified that he had studied finger-printing in Detroit, and in Chicago in 1923-1925 at Cook & Evans University, Sunshine Avenue; that after his work in school he had been associated with Earl Stevens, Superintendent of the Identification Bureau in Detroit; that while in Detroit, he worked for H. Fuller, whose address is now Free Press Building, Chicago, Illinois; and that he had been on the payroll of the Michigan Secret Service Police, Bovine Avenue, Detroit. In an attempt to check up on Coffey after hearing him give his training and experience which qualified him as a fingerprint expert, Mr. Redwine wrote letters to Earl Stevens, Cook & Evans University, the Michigan Secret Service Police Department and H. Fuller, at the addresses above given. All of his letters were returned unclaimed, except the one addressed to Stevens, who replied to Redwine's letter, stating Coffey was a total stranger to him and no one by that name had ever been employed in the Scientific Laboratories of the Police Department, nor did Coffey's name appear among the special officers employed by private detective agencies of that city, who are required by city ordinance to be registered with the Detroit Police Department. Stevens advised Redwine how he might check on Coffey and signed himself: "E. O. Stevens, (Lt. Earl O. Stevens), Supt. Scientific Laboratories, Police Department, Detroit, Michigan."

Coffey's testimony was of the utmost importance in this case. He testified his expert examination of the stone and of the shoes of deceased showed the finger prints of defendant upon each shoe and upon the stone. Courts have recognized that scientific authorities declare finger prints are reliable as means of identification, Moon v. State, 22 Ariz. 418, 198 P. 288, 16 A. L. R. 362, and annotations therein; see, also, annotations in 63 A. L. R. 1324. Indeed, Coffey has been accepted as an ex-

pert witness on finger prints in two cases by this court, Ingram v. Com., 265 Ky. 323, 96 S. W. (2d) 1017, and Green v. Com., 268 Ky. 475, 105 S. W. (2d) 585. But in neither the Ingram nor the Green case was a competent attack made below on Coffey's qualifications as an expert, and we held that on Coffey's undisputed testimony that he was such an expert the trial court did not err in permitting his evidence to go to the jury. If Coffey is expert in the science of finger-printing, his testimony is entitled to great weight; but if he is really not an expert and is merely an amateur doing inaccurate and unreliable work, his testimony is entitled to no weight. It strikes us that a thorough and complete investigation will disclose Coffey's qualifications and ability. In a case of this importance and where his testimony may well be the deciding factor, the court should have granted defendant a continuance so that Coffey's scientific qualifications might be inquired into and definitely settled.

The commonwealth moved the court to allow Coffey to demonstrate his science before the jury, and although the record shows no objection by defendant, the court overruled the motion. The record does not show the reasons why the court overruled this motion and we are unable to conceive what they might have been, as such a demonstration is within the discretion of the trial court, Moon v. State, supra; State v. Lapan, 101 Vt. 124, 141 A. 686. The demonstration might have been helpful, if not conclusive, in determining whether Coffey was able with any degree of accuracy to take finger prints from the stone and from the shoes.

It is argued by the commonwealth that defendant and his counsel, Mr. Redwine, had more than two months from the date of the examining trial the first part of July, until September 21st, the date his case was tried in the circuit court, to investigate Coffey's qualifications and to take proof thereon. This record shows defendant to be a poor, inexperienced, almost illiterate boy; and that he was unable to employ counsel for his trial in circuit court until the day before his case was called. It is difficult to see how his attorneys could be charged with the duty of investigating Coffey's qualifications before they were employed. Certainly, the defendant, who was confined in jail had neither the opportunity nor the means to make such investigation. From experience we know it is not unusual for a defendant

with very limited means to retain counsel to represent him in an examining trial, and then be unable to employ counsel for his trial in circuit court. This case is different from Sebree v. Com., 260 Ky. 526, 86 S. W. (2d) 282, where it was written that the failure to agree upon an attorney's fee until the day of trial is not sufficient cause for a continuance. In the Sebree case defendant's attorney appeared at his arraignment on the day the indictment was returned and agreed to the setting of the case on the day it was called. While in the instant case the record does not show defendant was accompanied by an attorney at his arraignment on the day the indictment was returned; and defendant's uncontradicted affidavit states that he was unable to employ counsel until the day before his trial. There is nothing in the record to show the court offered to appoint counsel to represent defendant when he was formally arraigned in court, and as he had no counsel at that time it was the duty of the court to then appoint some member of the bar to represent him.

Trial judges have a sound discretion in granting or refusing a continuance in both criminal and civil cases, and in the absence of an abuse of that discretion their ruling on such motions will not be interfered with here. The time and opportunity reasonably necessary to prepare a case for trial of necessity depends upon the facts and circumstances of each particular case. Graham v. Com., 200 Ky. 161, 252 S. W. 1012. Much has been written by this court on the constitutional rights of the defendant to be represented by counsel in criminal proceedings, and we have said that the right to be represented by counsel means counsel with reasonable opportunity to prepare the case. In the very recent case of Johnston v. Com., 276 Ky. 615, 124 S. W. (2d) 1035, 1038, we wrote: "A request for a continuance of a trial is but a means to an end. The end is a fair trial."

In Cass v. Com., 236 Ky. 462, 33 S. W. (2d) 332, wherein it was held that a continuance should have been granted to enable defendant and his counsel to prepare for trial, reference was made to many of the early cases, including McDaniel v. Com., 181 Ky. 766, 205 S. W. 915. While in Williams v. Com., 230 Ky. 327, 19 S. W. (2d) 964, will be found a number of cases wherein it was held the showing made was not sufficient to cause a continuance. In Hill v. Com., 191 Ky. 477, 230 S. W. 910, the court stated the affidavit for continuance con-

tained no facts showing the defendant was not prepared for trial. In Graham v. Com., supra, it was written that defendant's counsel must be presumed to be familiar with the facts as he went through the examining trial. In the instant case defendant's uncontradicted affidavit stated that he was unable to employ counsel until the day before his trial in circuit court. Although Mr. Redwine did go through the examining trial, he was not obligated to complete the investigation he had started of Coffey's qualifications and carry same into the foreign states of Michigan and Illinois and there take proof concerning them, because he did not know whether he would be employed for the trial in the circuit court until the day before the case was called.

Due to the unusual situation confronting the court here relative to the scientific qualifications of Coffey as a witness and concerning the great weight his testimony of necessity carried, we are of the opinion the court should have granted the continuance. We repeat here what was said in the Cass case, supra [236 Ky. 462, 33 S. W. (2d) 334] relative to a continuance:

"This is not a technical ground of reversal, but goes to the very foundation of justice—the right of a man to have counsel who have had opportunity to present his defense."

The jailer, his deputy, the coroner and two deputy sheriffs testified as witnesses for the commonwealth and defendant is complaining the court did not enforce the rule against these witnesses and require them to leave the court room, but permitted them to hear all the other witnesses testify who preceded them to the stand. Section 601 of the Civil Code of Practice provides the trial judge may exclude witnesses from the court room, but this section expressly excepts officers of the court. Section 151 of the Criminal Code of Practice makes Section 601 of the Civil Code applicable to criminal cases. Turner v. Com., 240 Ky. 536, 537, 42 S. W. (2d) 716. It cannot be doubted that the above-mentioned witnesses were all officers of the court and as such are expressly excepted under Section 601 of the Civil Code of Practice; therefore, there could have been no abuse of the discretion of the court in not excluding them from the court room. Defendant argues that Ab Nevius, the photographer who took the finger print pictures did not obey the rule but remained in the court room until called as a witness, hence, he should not have

been allowed to testify. The Turner case, supra, points out the trial court has a sound discretion in enforcing the rule against witnesses. Here all Nevius testified to was that he made certain photographs under the directions of Coffey, and it is apparent the court did not abuse its discretion in allowing him to testify even though he had remained in the court room all the while.

Defendant does not point out in his brief what incompetent evidence was introduced against him or what competent evidence the court excluded, but says:

"That we labored under tremendous handicaps, and were mowed down, as it were, by every ruling being adverse, is shown by all the places in the record as follows: (Here is inserted the numbers of 36 pages.)"

This is nothing more than an invitation for us to search the record, or at least 36 pages of it, in an effort to discover what errors the trial judge may have made in his rulings on evidence. This, we have written many times, we will not do. Lowery v. Com., 191 Ky. 657, 231 S. W. 234; Brandriff v. Com., 227 Ky. 389, 13 S. W. (2d) 273; Hamilton v. Com., 230 Ky. 207, 18 S. W. (2d) 995.

Complaint is made that in the opening statement, the attorney representing the commonwealth read a letter to the jury over the objection of the defendant, and O'Brien v. Com., 89 Ky. 354, 12 S. W. 471, 11 Ky. Law Rep. 534, is cited as showing this was improper. However, the record shows only the salutation and five words of the letter, to-wit: "Dear Fanny Mae: How are you getting along," were read when the court reversed his ruling and declined to let the letter be read then. It is obvious these very few words could not have prejudiced defendant's case. Defendant contends the attorney representing the commonwealth in his opening statement exhibited to the jury bloody clothes which had been worn by Isaac the night he was killed and which were never introduced in evidence. Defendant is mistaken—it was defendant's coat that the attorney referred to and it was later introduced in evidence through the witnesses Omer Booth and Madeline Wells being shown the coat and identifying it in the presence of the jury as the coat of defendant. Davis v. Com., 271 Ky. 180, 111 S. W. (2d) 640.

In the closing argument the attorney representing the commonwealth in commenting on defendant's youth

(evidently in answer to the argument of defendant's counsel to consider the youth of their client), named several notorious criminals and reminded the jury that they were all young men. This is not improper argument.

We reverse the case solely on the ground of the court's error in refusing to grant defendant's motion for a continuance.

Judgment reversed.

Whole Court sitting.